## In re HARING.

(District Court, W. D. Michigan, S. D.    January 8, 1912.)

1. BANKRUPTCY (§ 229*)—CONTEMPT PROCEEDINGS—REFEREE'S ORDER—CONCLUSIVENESS.

In proceedings against a bankrupt for contempt for disobeying an order of the referee requiring him to turn over money or property, the order may be given the weight to which it is entitled under all the circumstances, but the court should make an independent investigation and consider all material evidence relating to what preceded as well as what followed the referee's report, and from such investigation and from such evidence determine whether the order was justified, whether the bankrupt's disobedience is willful and contumacious, and whether he can comply.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 229.*]

2. BANKRUPTCY (§ 229*)—CONTEMPT BY BANKRUPT—POWER TO IMPRISON.

The federal District Court alone, and not a referee, can imprison a bankrupt for contempt of an order.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 229.*]

3. BANKRUPTCY (§ 229*)—CONTEMPT BY BANKRUPT—EVIDENCE—SUFFICIENCY.

Evidence in a contempt proceeding against a bankrupt *held* insufficient to establish his ability to pay over an amount ordered paid by the referee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 229.*]

In the matter of Jay A. Haring, bankrupt. On petition by the trustee to punish bankrupt for contempt. Petition denied.

Benn M. Corwin, for trustee.
Dunham & Phelps, for bankrupt.

SESSIONS, District Judge. The above-named bankrupt commenced business as a merchant in the village of Grant on the 10th day of February, 1910, and continued such business until January, 1911, when he was adjudged an involuntary bankrupt. His schedules were filed on February 6, 1911, and on February 27, 1911, William B. Holden, the present petitioner, was elected trustee. On the same date, and again on March 28, 1911, the bankrupt was examined at length, and his testimony reduced to writing. On April 6, 1911, the trustee filed a petition, alleging and charging that the bankrupt had "knowingly and fraudulently appropriated to his own use, and secreted and concealed from his creditors and from your petitioner as trustee in bankruptcy in this matter, a large amount of property or money, or both, belonging to his estate in bankruptcy, to wit, at least the sum of $6,676.21 in property or money, or both," and prayed for an order requiring him to account for such property or money. The bankrupt answered under oath, denying the allegations of fraud and concealment of property contained in the petition, and averring that he could not make any other or further accounting than he had already made. A hearing was had and proofs taken in behalf of the trustee. No proofs were taken on the part of the bankrupt, although he was present and was represented by counsel at the hearing. On October 14, 1911, the referee made and filed his finding based upon the testimony given by the bankrupt upon his former examination and upon the evidence produced in the matter of the accounting. This finding is thus summarized by the referee:

"I therefore find that the account against the respondent bankrupt should be stated as follows:

### Debits.

| | |
|---|---|
| 1. Merchandise on hand February 10th, 1910 | $ 2,700.00 |
| 2. Cash on hand February 10th, 1910 | 0.00 |
| 3. New merchandise | 13,263.56 |
| 4. Profits | 0.00 |
| Total debits | $15,963.56 |

### Credits.

| | |
|---|---|
| 1. Amount of inventory at cost price at time of filing petition | $ 6,128.76 |
| 2. Cash paid out as per check book | 3,164.45 |
| 3. Household and incidental expenses | 1,500.00 |
| 4. Losses on sales | 1,000.00 |
| 5. Accounts receivable | 20.00 |
| Total credits | $11,813.21 |
| Total debits | $15,963.56 |
| Total credits | 11,813.21 |
| Balance unaccounted for | 4,150.35 |
| Allowed for errors and omissions | 150.35 |
| Net amount | $ 4,000.00 |

"I therefore find that the respondent bankrupt has failed to account for property, or money, or both, of the value of $4,000, and that such amount belongs to this estate and is withheld from the trustee thereof."

The referee also made an order which concluded as follows:

"It is ordered that the said respondent bankrupt account for and pay to the trustee of this estate said sum of $4,000 within thirty days from the date that personal service of a copy of this order shall be made upon the said respondent bankrupt."

A copy of such order was duly served upon the bankrupt. He has not complied with the order, nor has he made any attempt to have the same reviewed. The trustee has now filed his petition in this court asking that the bankrupt be committed for contempt because of his failure and alleged willful refusal to comply with the order of the referee. The bankrupt has filed an answer under oath, again denying that he has concealed any property belonging to his estate, and that he has any such property in his possession, and averring his desire to comply with the order and his inability so to do and concluding with the statement:

"Deponent further says that he is unable to give any other or different explanation of his business than was given before said referee."

No additional proofs have been taken in this court.

[1, 2] Upon the threshold of this investigation, there is presented the question of what effect shall be given to the finding and order of the referee in the proceedings before him. Upon the determination of that question will depend in a large measure the conclusion or result to be reached in this matter. No steps have been taken to have the referee's order reviewed, and the bankrupt has offered no explanation of his failure to comply with and obey such order other than his bald reassertion of his inability so to do. Under these circumstances, is the finding and order of the referee conclusive upon both the bankrupt and this court, and is the duty of this court in the premises merely formal and ministerial, or is it the duty of this court to make an independent investigation of the facts disclosed by the evidence and to reach an independent conclusion based upon such investigation?

There are two distinct lines of decision upon this subject founded upon different and divergent theories and conceptions of the law. In one line are the courts which hold, in substance, that an order of the referee, made after a hearing and supported by evidence, adjudging the bankrupt to have in his possession and control a certain sum of money or specific property belonging to his estate and requiring him to turn over to the trustee such money or property, which order he neither obeys nor seeks to have reviewed, creates a presumption of the ability of the bankrupt to comply with the order and casts upon him the burden of proving the contrary, and that such presumption becomes final and conclusive unless the bankrupt gives an adequate explanation of what has become of the money or property. In re Frankel (D. C.) 184 Fed. 539, 25 Am. Bankr. Rep. 920; In re Stravrahn, 174 Fed. 330, 98 C. C. A. 202, 23 Am. Bankr. Rep. 168; In re Marks (D. C.) 176 Fed. 1018, 22 Am. Bankr. Rep. 568; In re Richards (D. C.) 183 Fed. 501, 25 Am. Bankr. Rep. 176; In re Cummings (D. C.) 186 Fed. 1020, 26 Am. Bankr. Rep. 130. In

the other line are the courts which hold, in substance, that in proceedings against a bankrupt for contempt for failure to obey an order of the referee requiring him to turn over money or property to the trustee such order may be referred to and given the weight to which it is entitled under all the circumstances, but the court should make a new and independent investigation, and should consider all material evidence relating to what preceded as well as what followed the referee's report, and from such investigation and from such evidence determine whether or not the order of the referee was justified, whether or not the bankrupt's disobedience thereof is willful and contumacious, and whether or not the bankrupt has the present ability to comply therewith. In re Davison (D. C.) 143 Fed. 673, 16 Am. Bankr. Rep. 337; In re Goodrich, 184 Fed. 5, 106 C. C. A. 207, 25 Am. Bankr. Rep. 789; In re Cole, 163 Fed. 180, 90 C. C. A. 50, 23 L. R. A. (N. S.) 255, 20 Am. Bankr. Rep. 761; Samel v. Dodd, 142 Fed. 68, 73 C. C. A. 254, 16 Am. Bankr. Rep. 163.

The Court of Appeals of this circuit has not passed upon this question, and therefore this court is at liberty, within proper limits, to adopt the view which seems to be the more consonant with reason. While the trend of the later decisions, particularly of those courts which are overcrowded with work, appears to be in the direction of the harsh and drastic rule followed in the cases first above cited, yet, after a careful and painstaking examination of the subject, I am unable to subscribe to the doctrine there enunciated. The tendency to impose the burden of proving his innocence upon one in fact charged with the commission of crime is a dangerous departure from those fundamental principles and constitutional guaranties which have been regarded as necessary for the adequate protection and sure safeguarding of the rights and liberty of every individual. Congress has not conferred upon referees in bankruptcy the power to imprison the bankrupt for contempt in failing or refusing to obey their orders. The court alone is authorized to exercise the power of commitment. Smith v. Belford, 106 Fed. 658–661, 45 C. C. A. 526; In re Schulman, 177 Fed. 191–193, 101 C. C. A. 361. The power of this court to imprison for an indirect contempt such as the one here alleged is undoubted; but it is also too well settled to admit of controversy that such power should be exercised with extreme care and caution and only upon the receipt of clear and convincing proof establishing the guilt of the accused. A discretionary act cannot be done by proxy. To hold that the investigation by this court of respondent's guilt or innocence must begin where that of the referee terminates is to deprive this court of the discretion vested in it by law and to confer upon the referee the power to do indirectly that which he cannot do directly. The bankruptcy act (Act July 1, 1898, c. 541, § 29b, subd. 1, 30 Stat. 554 [U. S. Comp. St. 1901, p. 3433]) expressly makes the willful and fraudulent concealment of his assets by the bankrupt a crime punishable by fine and imprisonment after conviction by a jury. The Constitution of this state expressly prohibits imprisonment for debt except in certain cases of fraud. It must be conceded that, under the law, courts are clothed with large powers in contempt

proceedings, but any arbitrary and unreasonable use of that power will inevitably invite further and more merited criticism, and add to the discontent and dissatisfaction which is already pronounced and widespread. While it is the duty of bankruptcy courts to enforce obedience to their lawful orders and to prevent willful disobedience thereof, yet they must in all cases be careful that their orders take neither the form of punishment for crime without a trial by jury nor the semblance of imprisonment for debt.

The danger of doing injustice which is always present in this class of proceedings is well illustrated in the Cummings Case, above cited. In that case an order was made by the referee requiring the bankrupt to pay to the trustee in bankruptcy a large sum of money. This order was affirmed upon review by the District Judge and later by the Circuit Court of Appeals. 184 Fed. 718. The bankrupt failed to comply with the order and upon petition of the trustee was cited for contempt. Acting upon the theory that the order requiring him to pay the money and his failure so to do made a prima facie case against him and created a presumption of his ability to pay the money, the District Court committed him "to the jail of Philadelphia county, there to remain until he pays to his trustee $69,317.14, with $20.00 costs, or until the further order of the court." After the bankrupt had been in jail for nearly two months, a further hearing was had upon his application to be released, and the same judge who had ordered him committed in granting his discharge from custody used the following language:

"The evidence just heard leaves no doubt in my mind about the financial situation of the bankrupt. He has no money or property, either in possession or under his control, and none is held for his benefit. He cannot pay any part of the money that he has been ordered to pay, and, so far as appears, he is never likely to have such ability. To confine him longer would be not only useless, but unlawful. If he has offended against the criminal law, the criminal law must punish him." In re Cummings (D. C.) 188 Fed. 767, 768, 26 Am. Bankr. Rep. 477–479.

If it be assumed that the order of the referee is final and conclusive as to the fraudulent concealment or disposition of property by the bankrupt, and as to the latter's obligation to repay the money or return the property to the estate, there still remains the vital question of his present ability to comply with such order. This question cannot be determined intelligently without a careful review and examination of the entire evidence in the case including the order and findings of the referee. If the bankrupt owes an obligation to his estate growing out of his fraudulent concealment of his property, he may be refused a discharge in bankruptcy, and his creditors will still be at liberty to collect their claims in any lawful manner. If he has committed a crime either by willfully concealing his assets or by swearing falsely, he may be indicted and put upon trial before a jury, and, after conviction, punished. Accounting proceedings before the referee are purely civil, while proceedings for contempt are criminal in both their nature and consequences. The decree or judgment of the referee based upon a fair preponderance of evidence will be sustained, but the proof which will justify a judgment depriving the

bankrupt of his liberty must at least be clear and convincing as in cases of fraud, and ought to be sufficient to convince beyond a reasonable doubt as in criminal actions. Therefore the essential elements of willful disobedience and present ability to obey must be established by clear and convincing proof before the court can find that the bankrupt is in contempt.

[3] Adopting and proceeding upon the theory that it is the duty of this court to examine the whole record and reach an independent conclusion at least as to the ability or inability of the bankrupt to comply with the order of the referee, the question to be determined is this: Is the evidence so convincing of his guilt as to require his commitment for contempt? His own testimony is evasive, indefinite, and very unsatisfactory, and creates a strong suspicion that he has not told the whole truth as to what has become of his property. He kept no books of account, his sales slips and memoranda have been destroyed, the invoices showing his purchases have disappeared, and his canceled checks cannot be found. Considerable quantities of goods were taken from his store to Sand Lake, and there sold by an inexperienced clerk whose testimony is nearly as unsatisfactory as that of the bankrupt himself. From time to time he made sworn statements for the purpose of obtaining credit which he now admits were untrue. When he commenced business he had a stock of goods worth $2,700. During the 11 months in which he was engaged in business he purchased additional goods to the value of $13,263.56. There is no way of determining the amount of his sales with any degree of accuracy, but the goods turned over to the trustee amounted, at cost price, to the sum of $6,129.76. It thus appears that goods of the cost value of $9,833.80 were sold, sacrificed by sales at a loss, or appropriated by some one. After crediting him with the moneys paid to his creditors and others, shown by his check stubs to have been $3,164.45, and making a very liberal allowance for his living and other expenses, the referee finds that there remains unaccounted for the sum of $4,000 in money or property. This finding is fully sustained by the proofs. The bankrupt claims to be wholly unable to explain this apparent shortage. During a portion of the time he was in ill health and his store was conducted by clerks. There is no proof of any goods having been taken from the store except for the purpose of sale elsewhere. No moneys are traced directly into the possession of the bankrupt except such as were deposited in bank or received from the clerk at Sand Lake. The moneys deposited in bank are all accounted for, and there is no way of ascertaining either how much was received as the net proceeds of the sales at Sand Lake or how much thereof was deposited in the bank. The testimony of the clerk upon this subject shows upon its face that it is the merest guesswork, and is so indefinite and unreliable as to be valueless.

Do these facts and the inferences and conclusions legitimately to be drawn therefrom sufficiently prove that the bankrupt now has in his possession the sum of $4,000 in money belonging to his estate, and thus establish his present ability to comply with the order of

the referee? Clearly not, unless, as claimed by counsel for the trustee, the rule "that the property of a bankrupt estate traced to the recent control or possession of the bankrupt is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance" is applicable. It is to be noted that the rule above stated has not been universally adopted by the courts, and that, generally speaking, the courts which have adopted it are those which hold that the burden is upon the bankrupt to prove his innocence of the charge made against him. In re Stravrahn, 174 Fed. 330, 98 C. C. A. 202, 23 Am. Bankr. Rep. 168; In re Averick (D. C.) 170 Fed. 521, 22 Am. Bankr. Rep. 518; In re Meier, 182 Fed. 799, 105 C. C. A. 231, 25 Am. Bankr. Rep. 272; In re Richards (D. C.) 183 Fed. 501, 25 Am. Bankr. Rep. 176; In re Lasky (D. C.) 163 Fed. 99, 20 Am. Bankr. Rep. 729.

However, if it be conceded that the burden and duty of explaining the disposition and disappearance of property or money recently in his possession rest upon the bankrupt, yet the proofs in this case fall short of establishing respondent's guilt. Most of the cases relied upon by the trustee are readily distinguishable in their facts from the present one. Here no money which has not been accounted for has been directly and reliably traced to the possession of the bankrupt and the order of the referee required him to pay to the trustee the sum of $4,000 in money. There is no positive testimony that he had in his possession at the time of his failure any part of the stock of goods except those located in the store and turned over to the trustee. Indeed, the theory of the trustee is not that the bankrupt has goods in his possession, but rather that he has converted goods into cash and has the money in his possession. The proof is wholly circumstantial, and rests upon a foundation of inference and presumption which may be very much at variance with the actual facts. At best, the case made against this bankrupt is a doubtful one, and, while in a clear case it is the plain duty of courts to enforce vigorously the provisions of the bankrupt act designed for the protection of creditors against the fraudulent acts of dishonest debtors, yet in a doubtful case it is the paramount duty of courts to safeguard the rights and liberties of debtors who may be honest in spite of appearances against them and whom the law presumes to be innocent until their guilt is clearly established.

In this case the evidence is sufficient to establish an indebtedness of the bankrupt to his estate in the sum of $4,000, and thus to justify the order of the referee requiring him to pay that sum to the trustee, but it is not sufficient to establish conclusively his present ability to pay that sum of money. In a similar case reported in the Federal Reporter (In re Reynolds, 190 Fed. 967), Judge Jones of the District Court of Alabama has tersely and correctly stated the rule of law in the following language:

"I cannot find, however, after a careful examination of the evidence, that it justified the finding of the referee that the bankrupt has now in his possession, or at the time the order was made, either the goods or the money proceeds amounting to $19,772.96, or any other sum. While the evidence

leaves no shadow of a doubt that the bankrupt had goods of that value for which he has not accounted, or has converted into money, and that at one time he had them under his control, I do not think the proof sustains the referee in the finding that at the time of the order, or at the time of his examination, the bankrupt still had in his possession or under his control either the goods or the money. After a very diligent investigation of his affairs,. no proof is offered showing the disposition of any specific goods, or tracing to him the possession of any considerable sum of money, or other evidence offered of such conduct as indicates that he now has any of the goods, or money derived from their conversion, in his possession or under his control.

"Under the decision in the case of Samel v. Dodd, 142 Fed. 71, 73 C. C. A. 254. rendered by our Circuit Court of Appeals, it is not within the power of the court, whatever view it may take of the bankrupt's version of affairs, to render a judgment for a surrender of goods or their alternative value, and attach the bankrupt for contempt for failing to turn over the goods or the money, although the proof may convince the court beyond all reasonable doubt that at one time the bankrupt had the goods or the money. The order must not be made, unless upon clear and convincing proof that the bankrupt has the goods or the property in his possession at the time of the making of the order and has the ability to comply with it. Under the influence of that decision, the court is compelled to reverse the order, and must decline to commit the bankrupt for contempt in failing to obey the order."

The petition of the trustee will be denied.